# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION

## CIVIL CASE NO. 1:12-cv-00068-MR
## [Criminal Case Nos. 1:08-cr-00082-MR-DLH-1;
## 1:09-cr-00055-MR-DLH-2; 1:09-cr-00058-MR-DLH-3]

| | | |
|---|---|---|
| VINCENT LAMAR BOULWARE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255; [Doc. 1]; the Government's Motion for Summary Judgment [Doc. 12]; Petitioner's Renewed Motion Requesting Leave to Conduct Discovery [Doc. 16]; Petitioner's Renewed Motion to Expand the Record [Doc. 18]; and Petitioner's Renewed Motion Requesting Psychological Expert to Establish Matter for the Defense Pursuant to 18 U.S.C. § 3006A [Doc. 19].

## I. BACKGROUND

### A. The Offense Conduct

#### 1. The Bank Robbery in the District of South Carolina

On March 7, 2008, Larry Copeland and Donald O'Leary entered the Bank of York, in York, South Carolina and, while brandishing pistols, robbed the bank of $18,550. [See Criminal Case No. 1:08-cr-00082-MR-DLH, Doc. 91 at 7]. In later statements to investigators, both Copeland and O'Leary confessed to the robbery and also implicated Petitioner as the getaway driver. [Id. at 8]. Copeland said that Petitioner had stopped the truck he was driving near the bank and told the other two to go into the bank, and O'Leary said that it was Petitioner who had written the stick-up note that they handed to the teller. [Id.]. When Petitioner was interviewed shortly after his arrest, he denied that he had driven Copeland and O'Leary to the bank and instead claimed that he had simply been in York a couple of days earlier to pick up his aunt. [Id.].

#### 2. The Bank Robbery the Middle District of North Carolina

On March 20, 2008, Copeland and Altoe Wallace entered a branch of First Citizens Bank and Trust in Greensboro, North Carolina, and robbed it of $11,670, with Wallace pressing a pistol muzzle into a teller's stomach during the crime. [Id. at 8-9]. When interviewed by law enforcement

investigators following his arrest, Copeland said that this robbery was Petitioner's idea and that Petitioner was the getaway driver. [Id. at 9]. When the FBI interviewed Petitioner a few months after his arrest, he said that he knew that Copeland and "Altoe" were going to Greensboro to commit a robbery and that Copeland asked Petitioner to pick them up in Salisbury after the robbery. [Id.] He denied that he knew it was a bank that they were going to rob, but he did say that he agreed to drive them away from the area after they abandoned the car they had used to commit the robbery. [Id.].

### 3. The Bank Robbery in the Western District of North Carolina

On April 7, 2008, Copeland and O'Leary entered the Premier Credit Union in Forest City, North Carolina, and ordered everyone onto the floor, after which one of them pistol-whipped the branch manager, one of them pointed a gun at a teller, and they threatened to shoot someone. [Id.]. They fled the bank with $18,900 and a teller's purse, leaving in a green Ford Thunderbird, but then switching to a black pickup truck. [Id. at 10]. In his post-arrest interview, Copeland said that he and Petitioner had driven past this bank the day before the robbery and Petitioner had said that this was "the one"; that Copeland used an unloaded .357 pistol during this robbery; that Petitioner planned all the robberies; and that they split the

money from the robbery. [Id.]. O'Leary also admitted his involvement in this robbery and said that Petitioner was the getaway driver. [Id.]. He said that he, Copeland, and Petitioner had traveled to Forest City the day before the robbery and had picked out the bank they were going to rob. [Id.]. Petitioner drove them to Forest City in a black Ford pickup truck and Copeland bought a stolen green Thunderbird that they dropped off near the bank the night before the robbery. [Id.]. O'Leary claimed that Petitioner was the "brains" behind the robberies and provided Copeland with the gun. [Id.]. When Petitioner was interviewed shortly after his arrest by the Forest City Police, he said he had no knowledge of the robbery. [Id.]. Rather, he claimed that Copeland had called him on April 6, 2008, and asked him to give Copeland and O'Leary a ride to Shelby, North Carolina, to get some "weed," which Petitioner said he agreed to do in exchange for some of the "weed" and $140, and he claimed that he had dropped Copeland and O'Leary off at a restaurant in Shelby on the morning of April 7 and had waited for two hours for their return, after which he drove them back. [Id.].

## B. Procedural History

On August 5, 2008, the Grand Jury for the Western District of North Carolina charged Petitioner Vincent Lamar Boulware, Larry Michael Copeland, and Donald Gerard O'Leary with bank robbery, in violation of 18

4

U.S.C. § 2113(a), putting the life of another person in jeopardy during a bank robbery, in violation of 18 U.S.C. § 2113(d), and using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  [Criminal Case No. 1:08-cr-00082-MR-DLH, Doc. 1: Indictment].  Petitioner was also charged in the District of South Carolina and the Middle District of North Carolina for the bank robberies in those districts, and those cases were transferred to this district pursuant to Federal Rule of Criminal Procedure 20.  The June 11, 2009, criminal information from the District of South Carolina charged Petitioner, Copeland, and O'Leary with bank robbery.  [Criminal Case No. 1:09-cr-00058-MR-DLH, Doc. 1].  That case was transferred to this District on June 11, 2009.  The June 30, 2008, indictment from the Middle District of North Carolina charged Petitioner, Copeland, and Altoe Lahmond Wallace with bank robbery and using a firearm during and in relation to a crime of violence.  [Criminal Case No. 1:09-cr-00055-MR-DLH, Doc. 2].  That case was transferred to this District on May 27, 2009.

Petitioner was arraigned on the indictment in this Court on August 18, 2008.  [Criminal Case No. 1:08-cr-00082-MR-DLH, Docket Entry for 8/18/2008].  On August 28, 2008, Petitioner's counsel, Victoria Jayne, filed an ex parte motion for an independent psychological evaluation or, in the

alternative, for an examination by Government mental health experts.  See [Id., Doc. 11: Ex Parte Motion for Psychological Evaluation; Doc. 117: Motion Hearing Tr.].  In her motion, Ms. Jayne cited, among other things, her observations that Petitioner could not read a complete sentence, that he reported that he had been in foster care for several years because he would not go to school, that he had been bullied by others, including co-defendant Copeland, and that he exhibited great distress, depression, and confusion about the statements he had made and the charges against him. [Id.].

On September 3, 2008, Magistrate Judge Howell conducted a hearing on that motion, at the beginning of which the Court and Ms. Jayne discussed her having filed her motion *ex parte*, with Ms. Jayne saying that she had done so because she had previously been advised by Judge Voorhees that this was the appropriate procedure and that it was not necessary for her to notice the Government.  [Id., Doc. 117 at 2].  She asked the Court to consider conducting the hearing *ex parte* as well, but the Court replied that the Government needed to know about a motion for a psychological evaluation.  [Id.].  Ms. Jayne replied that of course the Government would learn if the motion were granted and an evaluation occurred, but she repeated that she thought the request for such an

examination was to be filed *ex parte*.  [Id. at 3].  The Court responded that in regards to a motion for a mental health evaluation, the Government "need[ed] to be aware of that because you've also got a Rule 12 situation. They've got a right to know about it."  [Id.].

After Ms. Jayne provided a copy of her motion to the prosecutor in court, she argued for her motion and provided additional observations of Petitioner's apparent mental state.  [Id. at 4-7].  The Government did not object to having Petitioner evaluated, but stated that the Court should order that it be done within the Bureau of Prisons system rather than by a private psychologist.  [Id. at 9].  The Court denied without prejudice that portion of the motion seeking an evaluation by private physician Dr. John Warren and, instead, ruled that Petitioner would be evaluated at a facility to be determined by the Department of Justice.  [Id. at 9-10].  The Court stated that, after the examination through the government, the Court would entertain another motion by Ms. Jayne for a private examination.  [Id. at 10].

On September 5, 2008, the Court memorialized its ruling, ordering Petitioner to be committed to the custody of the Attorney General and examined pursuant to 18 U.S.C. §§ 4241 and 4242, and Federal Rule of Criminal Procedure 12.2(c) to determine if he was currently insane or so

mentally incompetent as to be unable to understand the proceedings against him or to assist in his defense, and to determine whether he was criminally responsible at the time of the commission of the alleged offense. [Id., Doc. 14: Order Granting Ex Parte Motion as to Vincent Lamar Boulware].  The Order also instructed Petitioner's counsel that, in the event the Government's experts determined that Petitioner was competent, she could file a motion for appointment and examination by independent experts.  [Id. at 4-5].

On January 5, 2009, a report was filed concluding that there was no objective evidence indicating that Petitioner was suffering from any major mental disorder or condition that would impair his ability to understand the nature and consequences of the court proceedings against him or his ability to assist counsel in his defense, nor was there evidence that Petitioner suffered from a condition that rendered him unable to appreciate the nature, quality, or wrongfulness of his actions during the time period of the alleged offense.  [Id., Doc. 45: Psychiatric Report].  Although the report stated that Petitioner's test scores indicated that he was in the extremely low range of intellectual functioning, with a verbal reasoning ability in the borderline range and a nonverbal reasoning ability in the extremely low range, the report also noted that Petitioner's scores were lowered by his

not earning full credit for his answers due to his failing to finish his responses within the allotted time. [Id. at 10]. The report stated that Petitioner's manner indicated that if given more time or prompted he would be able to respond with the correct answer. [Id. at 14].

The report concluded that this suggested that Petitioner functioned at a higher level than indicated by his test scores. [Id. at 10]. In a test for mental retardation, Petitioner performed tasks in the high or moderate range except for those dealing with memory/orientation and managing home and transportation, for which he was in the low range. [Id. at 11]. The report rejected a diagnosis of mild mental retardation in light of his test scores and the reported level of his functioning, including his ability to obtain and maintain a driver's license, a flea market vendor's license, his ability to enroll in GED classes at a community college, and his ability to commit prior bank frauds through issuing and cashing forged checks. [Id. at 14-15]. Regarding his understanding of the criminal proceedings, on one test Petitioner scored higher than the mean score for criminal defendants without mental retardation, with an overall score of 93% correct, and in other tests he scored 96%, 87%, and 95% correct. [Id. at 15]. The report also observed that during his monitored telephone conversations with his mother and others, Petitioner was clear, coherent, and goal-directed,

without delay, had adequate recall of events, fluid speech and articulation, and seemed focused and able to track the content of other people's conversations. [Id. at 8]. The people who interacted with him did not respond as though he had any significant deficits. [Id.].

As for Petitioner's criminal responsibility at the time of the offense, the report concluded that his behavior was not the product of a severe mental disorder. [Id. at 17]. The report stated that he was guarded and evasive when discussing the events and "seemed to take every opportunity to minimize his behavior" and to try to paint himself in a good light. [Id.]. The report also stated that he had the ability to appreciate the nature, quality, and wrongfulness of his actions and he was not significantly impaired by any underlying severe mental disorder at the time of the offense. [Id. at 18].

On February 6, 2009, Petitioner's counsel filed a sealed *ex parte* motion for an independent mental health evaluation, which the Court granted on February 18, 2009, authorizing an expenditure of $1,500. See [Id., Doc. 49: Order]. The report, filed with the Court on March 26, 2009, and submitted by private psychologist Dr. Warren, concluded that Petitioner met the criteria for a diagnosis of mild mental retardation, and that he had that condition at the time of the alleged offense. [Id., Doc. 55: Report]. As

a result, the report opined that Petitioner was "particularly susceptible to manipulation and being taken advantage of by others." [Id. at 1]. Despite this condition, however, the report stated that Petitioner had "a basic understanding of his legal situation and [could] assist his attorney in a rational, albeit simplistic, manner." [Id.].

The reports from Petitioner's mental evaluation were admitted at a competency hearing on April 28, 2009, and Judge Howell found that Petitioner was not suffering from any mental disease or defect and that he was able to assist his counsel. [Id., Doc. 118 at 4: Transcript of Competency Hearing].

On April 30, 2009, the parties filed a written plea agreement in which Petitioner agreed to plead guilty to the bank robbery charge in the Western District's indictment, and also agreed to the Rule 20 transfers of the indictment from the Middle District of North Carolina and the criminal information from the District of South Carolina for purposes of his pleading guilty to those charges as well. [Id., Doc. 63: Plea Agreement]. On May 6, 2009, Defendant pled to the bank robbery count in the Western District's indictment; on June 11, 2009, he pled to bank robbery from the Middle District; and on July 9, 2009, he pled to the bank robbery from the District of South Carolina. [Id., Doc. 119; Criminal Case No. 1:09-cr-00055-MR-

DLH, Doc. 32; Criminal Case No. 1:09-cr-00058-MR-DLH, Doc. 44]. During each of these hearings, the Court informed Petitioner of the maximum punishment for the offense to which he was pleading guilty.  <u>See</u> [Criminal Case No. 1:08-cr-00082-MR-DLH, Doc. 119 at 8-9 (20 years); Criminal Case No. 1:09-cr-00055-MR-DLH, Doc. 32 at 14 (10 years); Criminal Case No. 1:09-cr-00058-MR-DLH, Doc. 44 at 9 (20 years)].  The written agreements in each case contained a provision that the Court would determine the appropriate sentence, and that "any estimate from any source, including defense counsel, of the likely sentence is a prediction rather than a promise, and that the Court has the final discretion to impose any sentence up to the statutory maximum for each count."  [<u>Id.</u>, Doc. 63 at ¶ 8; Criminal Case No.1:09-cr-00055-MR-DLH, Doc. 14 at ¶ 8; Criminal Case No. 1:09-cr-00058-MR-DLH, Doc. 2 at ¶ 8].

During each hearing, Petitioner acknowledged that he understood that he might receive a sentence that was higher or lower than the guidelines, and that if his sentence were higher than he expected he would still be bound by his guilty plea.  <u>See</u> [Criminal Case No. 1:08-cr-00082-MR-DLH, Doc. 119 at 11-12; Criminal Case No. 1:09-cr-00055-MR-DLH, Doc. 32 at 17; Criminal Case No. 1:09-cr-00058-MR-DLH, Doc. 44 at 19-20].  Additionally, during each of the three hearings, the prosecutor

summarized the major terms of the plea agreement and specifically highlighted the provision regarding Petitioner's waiver of his appellate rights and the right to collaterally challenge his judgment or sentence.  See [Criminal Case No. 1:08-cr-00082-MR-DLH, Doc. 119 at 15-16; Criminal Case No. 1:09-cr-00055-MR-DLH, Doc. 32 at 21; Criminal Case No. 1:09-cr-00058-MR-DLH, Doc 44 at 24].  In response to questioning by the Court on this point, Petitioner three times stated that he understood his appellate rights and collateral attack rights and that he knowingly and willingly accepted the limitations on those rights set forth in the agreement. [Criminal Case No. 1:08-cr-00082-MR-DLH, Doc. 119 at 17; Criminal Case No. 1:09-cr-00055-MR-DLH, Doc. 32 at 22; Criminal Case No. 1:09-cr-00058-MR-DLH, Doc. 44 at 25].

A presentence investigation report ("PSR") was filed in this Court on February 9, 2010.  [Criminal Case No. 1:08-cr-82-MR-1, Doc. 70: PSR]. During his interview with the probation officer who prepared the PSR, and in the presence of his counsel, Petitioner admitted that he had been involved in all three robberies, and he said that his co-defendants had asked him to pick them up after the robberies, and that they gave him money and some marijuana.  [Id. at 13].

The PSR calculated the adjusted offense level for the Western District robbery as level 33, which included upward adjustments for the robbery of a financial institution, the use of a firearm, the bodily injury and physical restraint of a victim, and a loss of more than $10,000. [Id., Doc. 91 at 14]. Both the Middle District of North Carolina and the District of South Carolina convictions received adjusted offense levels of 29, which included enhancements for the robbery of a financial institution, the use of a firearm, and a loss of over $10,000. [Id. at 15-16]. Applying the multiple-count adjustment rules of U.S.S.G. § 3D1.4, the combined offense level was 36, with a reduction for acceptance of responsibility yielding a total offense level of 33. [Id. at 16]. Combined with Petitioner's criminal history category of IV, the advisory guidelines range was 188 to 235 months of imprisonment. [Id. at 34].

On March 30, 2010, Petitioner filed objections to the PSR's offense level computation, including the enhancements for the use of a firearm and the bodily injury and victim restraint enhancements, contending that Petitioner was an accessory after the fact to the bank robberies, playing no part in the planning nor in transporting the codefendants to the banks, but that he had merely driven them afterwards. [Id., Doc. 88 at 1]. The defense also objected to the criminal history calculation, stating that

Petitioner had no memory of one conviction, that he denied he was the defendant in another, and that the charge had been dismissed in a third matter.  [Id. at 2].

The final PSR was filed on April 8, 2010.  [Id., Doc. 91: Final PSR; Doc. 93: Sealed Sentencing Memorandum].  The probation office rejected Petitioner's objections and recommended no change to the PSR.  [Id., Doc. 91 at 38-39].  Additionally, the probation office noted that, in light of Petitioner's contentions minimizing his role and knowledge of the crimes, it was questionable whether he should continue to receive the three-level reduction for acceptance of responsibility.  [Id. at 38].

On June 28, 2010, Petitioner filed a motion for a downward departure, citing the experts' opinions that he had a low range of intellectual functioning and Dr. Warren's conclusion that he was extremely vulnerable to the influence and bullying of others.  [Id., Doc. 93: Motion for Downward Departure].  The defense argued that but for Petitioner's "diminished capacity," he would have escaped involvement in these robberies.  [Id. at 1].  The motion conceded that Petitioner had the capacity to understand the wrongfulness of his actions but requested that the Court provide "greater consideration" for Petitioner's mental condition by departing downward.  [Id. at 2].  The motion also informed the Court of

counsel's continued concerns about the apparent deterioration of Petitioner's understanding of his situation, and her most recent request for another mental examination.  [Id.].

On July 2, 2010, in response to Petitioner's objections to the PSR and to the motion for a downward departure, the Government filed a sentencing memorandum, contrasting Petitioner's claim that he was a mere accessory after the fact with the evidence about the three bank robberies, including admissions made by Petitioner to the FBI.  See [Id., Doc. 95: Gov't Sentencing Memo.].  The Government agreed with the probation officer's statement that Petitioner might not deserve the reduction for acceptance of responsibility, and also submitted that the Court should consider a two-level increase for obstruction of justice, as provided by U.S.S.G. § 3C1.1 cmt. 4(h), for providing materially false information to a probation officer in respect to a presentence investigation.  [Id. at 11].  The Government's memorandum also opposed Petitioner's motion for a downward departure.  [Id. at 11-12].  Applying the findings of the mental health reports, the memorandum noted that the Government's experts had rejected a diagnosis of mild mental retardation, and that Dr. Warren's diagnosis was based on much more limited information.  [Id. at 13].  The Government argued that, even under Dr. Warren's conclusions, Petitioner

still could appreciate the wrongfulness of his actions, as evidenced by Petitioner's own statements to law enforcement agents. [Id. at 14-15].

On March 10, 2010, after the initial PSR had been filed, defense counsel filed, under seal, a third motion for a psychiatric or psychological examination or a competency determination, in which she stated that Petitioner's mental health was declining and that she was aware of co-defendant Copeland's continued influence on Petitioner's actions, such that she feared that Petitioner's guilty pleas "may have been less than voluntary" and may have been the result of his efforts to please those around him. [Criminal Case No. 1:08-cr-82-MR-1, Doc. 79 at 1: Motion for Psychiatric or Psychological Examination]. She also stated that she had difficulty in discussing the PSR and the sentencing guidelines with Petitioner, and that he appeared to be confused and distraught and was having memory problems. [Id. at 2].

Magistrate Judge Howell conducted a hearing on this motion on March 22, 2010. [Id., Doc. 124: Motion for Competency Evaluation Tr.]. defense counsel cited the first competency report's findings that Petitioner functioned in an extremely low range of intelligence, and Dr. Warren's statement that Petitioner was "easily manipulated and could be easily led by those around him." [Id. at 2-3]. She told the Court that she had filed her

motion for another competency examination because she had observed "a marked deterioration in [Petitioner's] ability to communicate with [her,] [and] in his memory. [Id. at 4]. She also expressed her concern that some of Petitioner's actions, including his entries of the three guilty pleas, "may have been more about pleasing [her] or . . . his codefendants and the court," rather than being voluntary. [Id. at 4-5]. She said that she believed it was incumbent upon her to seek another competency evaluation so that she could determine whether she could advise the judge at sentencing that her client understood everything he was doing. [Id. at 6]. She also expressed her concern about ongoing communication with co-defendant Copeland and his possible influence. [Id. at 6-8].

The Court replied that the conclusion of the reports was that Petitioner was competent but that everyone should go slowly so that Petitioner could understand everything. [Id. at 8]. Ms. Jayne responded that she was concerned that more than a year had passed since the earlier evaluations, and that some new sort of mental illness may have started that possibly could be corrected through medication. [Id. at 9; 11]. She said that she believed that Petitioner understood what he was doing when he entered his guilty pleas, or at least it seemed that he did, but that she was concerned with what had happened since those plea hearings, based on

her difficulty communicating with Petitioner and his apparent memory problems.  [Id. at 12].

On March 25, 2010, the Court issued a written order denying the motion.  See [Id., Doc. 86: Order].  The Court observed that the first forensic report had already addressed the same issue that Ms. Jayne was raising anew, Petitioner's possible susceptibility to manipulation by others.  [Id. at 2-3].  As to counsel's stated concern that Petitioner's intelligence level might have affected the knowing and voluntary nature of his guilty plea, the Court quoted from the portion of the earlier report concluding that Petitioner had scored higher than the mean score for those defendants without any mental retardation, with an overall correct score of 93%, and scores of 96%, 87%, and 95% on other tests concerning legal concepts, skills needed to assist counsel, and understanding of case events.  [Id. at 3-4].  The Court concluded that, notwithstanding his low intelligence, Petitioner was capable of functioning at or above the mean level of criminal defendants.  [Id. at 4].  The Court also reviewed the electronic transcripts and its own notes from the Rule 11 hearings, finding no indication that Petitioner's pleas had been anything less than knowing and voluntary.  [Id.].

At the sentencing hearing held on July 8, 2010, the Court questioned Petitioner to determine that he remembered his answers at the three Rule

11 hearings, that his answers were true and correct, and that Petitioner was pleading guilty voluntarily, and the Court then accepted Petitioner's guilty pleas. See [Id., Doc. 120 at 5-7: Sentencing Hearing Tr.]. Petitioner told the Court that he had reviewed the PSR with his attorney and he understood its contents, and Ms. Jayne confirmed that she was satisfied that Petitioner understood the PSR. [Id. at 8].

Turning to Petitioner's objections to the offense level enhancements, Ms. Jayne told the Court that based on further information from the probation officer and additional conversations with the Government, as well as speaking with Petitioner, she was withdrawing those objections. [Id. at 9; 10-11]. Ms. Jayne spoke of Petitioner's mental abilities and his difficulty in understanding why he would receive enhancements for the use of the firearm and other matters occurring inside the banks when he had only been the getaway driver, but said that he wanted the Court to be sure to know that he was accepting responsibility for his involvement in the bank robberies. [Id. at 10]. The Government then withdrew its request that Petitioner not receive the full reduction for acceptance of responsibility. [Id. at 12]. Accordingly, the Court accepted the PSR's calculation of the advisory range of 188 to 235 months. [Id. at 12-13].

During her argument, Ms. Jayne highlighted Dr. Warren's conclusion as to Petitioner's low intellectual functioning and susceptibility to manipulation by others as relevant factors for the court to consider, but she also stated that she was not arguing that Petitioner was not competent. [Id. at 15]. Petitioner also addressed the Court at some length, in a rational and coherent fashion. [Id. at 22-25]. In determining its sentence, the Court noted that it had considered the mental evaluations, but concluded that they did not take Petitioner's case out of the heartland, and did not warrant a sentence outside the guidelines range. [Id. at 27]. The Court did conclude, however, that Petitioner's mental condition warranted a sentence at the low end of that range, at 188 months, and imposed that sentence for each of the three bank robberies, all concurrent with one another. [Id. at 27; 28].

On appeal, Petitioner challenged his sentence, but the Fourth Circuit held that he had knowingly and voluntarily waived the right to appeal his sentence. [Id., Doc. 125 at 3]. Petitioner also raised essentially the same ineffective assistance of counsel arguments as he now makes in his instant motion, and the Court concluded that there was no conclusive evidence of ineffectiveness on the face of the record, and declined to address the merits of that argument. [Id. at 4].

Petitioner filed the instant, timely motion to vacate on April 9, 2012, placing the motion to vacate in the prison system for mailing on March 29, 2012. [Doc. 1]. On June 25, 2012, the Government filed a motion for summary judgment. [Doc. 12]. On August 15, 2012, this Court entered an Order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Petitioner of his obligation to file a response to the Motion for Summary Judgment, and explaining the requirement that he present his own evidence by affidavit or unsworn declarations. [Doc. 13]. On September 18. 2012, Petitioner filed a Response to the motion for summary judgment. [Doc. 14]. Petitioner did not present any evidence in response to the summary judgment motion in the form of new affidavits[1] or exhibits. He merely reiterated the arguments made in his initial motion to vacate, and he specifically incorporated the memorandum and his affidavit that were filed with the original motion to vacate. [Doc. 14 at 8].

Finally, on that same date Petitioner filed a Motion Requesting Leave to Conduct Discovery [Doc. 16]; a Motion to Expand the Record, [Doc. 18]; and a Motion Requesting Psychological Expert to Establish Matter for the Defense Pursuant to 18 U.S.C. § 3006A [Doc. 19]. Petitioner brings the

---

[1] Petitioner filed a document entitled "Supplementary Affidavit" [Doc. 15] which consists of three short bullet points that are more in the nature of argument. That document, however, is not sworn or signed under penalty of perjury.

following grounds for relief in his motion to vacate: (1) Petitioner's plea was not knowing because he was sedated and he is mildly retarded; (2) Petitioner did not receive effective assistance of counsel with respect to his defense pursuant to 18 U.S.C. § 3006A(e); (3) bad faith and unfair dealing with respect to the plea agreement denied Petitioner due process and is manifestly unfair; (4) Petitioner received ineffective assistance of counsel because counsel grossly underestimated sentencing factors; (5) and Petitioner received ineffective assistance of counsel because counsel failed to procure a 18 U.S.C. § 3006A(e) psychological expert, and failed to move for a U.S.S.G. § 5K2.13 downward departure with that expert's help.

## II.    STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  The rule goes on to provide procedures for responding to a motion for summary judgment:

c) Procedures.

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.

(4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues of fact for trial.

Once the moving party has met that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Rather, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56).

## III.  DISCUSSION

### A.  Petitioner's Grounds One and Three

In Ground One of his motion, Petitioner argues that his guilty pleas were not made knowingly and voluntarily because he is mildly retarded and did not understand the plea colloquy, and because he was medicated.[2]  In Ground Three, he again asserts that he is mentally retarded, and argues that it is an abuse of the plea process to allow a mentally retarded person to sign a waiver of appellate rights.  Petitioner did not raise these claims on

---

[2]  Petitioner's motion speaks in the singular of his guilty plea but, as previously recounted, he actually pled guilty three different times, in three different Rule 11 hearings.

direct appeal.  Petitioner may not use Section 2255 as a substitute for an appeal.  See United States v. Frady, 456 U.S. 152, 165-66 (1982); see also Bousley v. United States, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and 'will not be allowed to do service for an appeal.'") (quoting Reed v. Farley, 512 U.S. 339, 354 (1994)).  Accordingly, there is a presumption that "[o]nce the defendant's chance to appeal has been waived or exhausted, . . . he stands fairly and finally convicted."  Frady, 456 U.S. at 164.  Further, as stated by the Fourth Circuit in United States v. Mikalajunas, 186 F.3d 490, 492-93 (4th Cir. 1999), "[i]n order to collaterally attack a conviction or sentence based upon errors that could have been but were not pursued on direct appeal, the movant must show cause and actual prejudice resulting from the errors of which he complains or he must demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack."  Id. (citing Frady, 456 U.S. at 167-68).

Petitioner did not raise his contentions on direct appeal.  Thus, unless Petitioner can show cause and prejudice, his failure to raise these issues on appeal bars any review pursuant to 28 U.S.C. § 2255.  As the Supreme Court has made clear, a defendant seeking collateral relief based on errors not raised at trial or on appeal must show "cause" excusing his procedural

default and "actual prejudice" resulting from the alleged errors. <u>Frady</u>, 456 U.S. at 167-68; <u>see also</u> <u>United States v. Maybeck</u>, 23 F.3d 888, 891 (4th Cir. 1994) (stating that the failure to make a contemporaneous objection at trial requires the establishment of cause and prejudice in a Section 2255 proceeding).

Here, Petitioner does not even address these factors. He does not attempt to explain his failure to raise these issues on direct appeal, nor does he offer evidence to establish "cause and actual prejudice" or that he is innocent of the charges. He simply requests that his sentence and conviction be set aside and/or vacated based on the allegations in his § 2255 motion. Because Petitioner has presented no forecast of evidence as to cause or prejudice with respect to his failure to raise the claim in Grounds One and Three, those claims are not cognizable under 28 U.S.C. § 2255.

## B.  Grounds Two, Four and Five

In the remaining grounds of his motion, Petitioner alleges that his counsel was ineffective for failing to obtain an independent privileged expert evaluation in order to mount a defense and to obtain a downward departure for diminished capacity, and for "grossly" underestimating the sentence he would receive. The Sixth Amendment to the U.S. Constitution

guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. <u>See</u> U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id.</u> at 689; <u>see also</u> <u>United States v. Luck</u>, 611 F.3d 183, 186 (4th Cir. 2010).

Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . <u>Strickland</u> if the 'result of the proceeding was fundamentally unfair or unreliable.'" <u>Sexton v. French</u>, 163 F.3d 874, 882 (4th Cir. 1998) (quoting <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." <u>Bowie v. Branker</u>, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." <u>United States v. Rhynes</u>, 196 F.3d 207, 232 (4th Cir. 1999), <u>opinion vacated on other grounds</u>, 218 F.3d 310 (4th Cir. 2000).

Finally, to demonstrate prejudice in the context of a guilty plea, a petitioner must show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). In evaluating such a claim, statements made by a defendant under oath at the plea hearing carry a "strong presumption of verity" and present a "formidable barrier" to subsequent collateral attacks. Blackledge v. Allison, 431 U.S. 63, 73-74 (1977). Indeed, "in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should . . . dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." Lemaster, 403 F.3d at 221-22.

### 1.    The Mental Examinations

In Ground Two, Petitioner alleges ineffective assistance of counsel based on Ms. Jayne's supposed failure to advocate for a privileged investigation into his mental state and into whether he was excessively submissive or compliant with demands by his co-defendant. He contends that Ms. Jayne was constitutionally ineffective for failing to seek to retain a private mental health expert, with the use of Criminal Justice Act (CJA) funds pursuant to 18 U.S.C. § 3006A, so that the Government would not

have been aware of the examination and its results. As the record demonstrates, however, Ms. Jayne *did* seek such an examination. Indeed, as the Court has already discussed, supra, she sought it twice. In her original motion on this matter, filed *ex parte*, she did precisely what Petitioner now claims she neglected to do. That is, she moved for CJA funds to retain a private mental health expert, and only referenced 18 U.S.C. §§ 4241 and 4242 as an alternative basis for the examination should the Court deny her motion to retain a private expert. After the Court denied her motion for a private examination and ordered an examination by Government experts, and after those experts' report was filed, she moved a *second time* for authorization to hire a private expert, which the Court *granted*. This chronology is further detailed in Ms. Jayne's affidavit, in which she states that twelve days after her appointment she first filed an ex parte motion requesting up to $5,000 to retain the services of an expert to conduct a forensic psychological evaluation of Petitioner. [Doc. 11-1 at ¶ 2: Gov't's Ex. 1]. She also requested funds to retain a private investigator to evaluate the evidence and to locate and interview possible defense witnesses. [Id. at ¶ 3]. Magistrate Judge Howell allowed both motions, but limited the funds for the mental exam to $1,500, and over her objection he informed the Government of her motion and requested an evaluation by the

Bureau of Prisons prior to the examination by the expert she was hiring. [Id. at ¶ 4]. Ms. Jayne notes that all the doctors who evaluated Petitioner found him to be competent at the time of the offenses and competent to stand trial. [Id. at ¶ 6].

Raising a similar argument as in Ground Two, Petitioner complains in Ground Five that Ms. Jayne was not effective "when she failed to have completed an 18 U.S.C. § 3006A exam," thereby harming his evaluation for a diminished capacity departure. The record contradicts Petitioner's allegation, however, because Ms. Jayne not only made those earlier efforts, but she made yet a third attempt, in her March 10, 2010, motion, to have the Court provide for such an examination. The Court, following a hearing on this motion, denied her request. Ms. Jayne also moved on Petitioner's behalf for a downward departure based on Petitioner's mental state, making use of the experts' reports, and argued for such a departure at sentencing. The Court found that Petitioner's mental condition did not warrant such a departure, but it did find that his condition merited a sentence at the low end of the guideline range.

Petitioner has simply presented no forecast of evidence to support his argument of ineffective assistance of counsel, given that Ms. Jayne repeatedly sought a "privileged investigation" of his mental condition. The

gist of Petitioner's complaint is that Ms. Jayne was unsuccessful in her diligent and repeated efforts to obtain § 3006A funds to obtain an opinion by a defense expert that could remain secret from the Government. Indeed, Ms. Jayne did all she could to try to convince the Court to order such an examination, and she was not ineffective merely because the Court denied her request. At bottom, Petitioner is trying to use a § 2255 motion to mount an attack on this Court's prior decisions regarding Ms. Jayne's motions. Petitioner, however, did not raise this on appeal, and therefore is prohibited from raising it in this context.

### 2. Promises of a Likely Sentence

In Ground Four, Petitioner argues that Ms. Jayne was ineffective based on his allegation that she erroneously estimated that his sentencing range would be 57-71 months, while the actual sentencing range turned out to be 188-235. He argues that his guilty plea was "tainted by [counsel's] gross underestimation of [Petitioner's] eventual sentence," and that he would have argued for a lesser sentence or insisted on trial if he had not been so mis-advised. [Doc. 1-1 at 25]. Where, as here, a Petitioner has pled guilty, he must show that but for counsel's unprofessional errors, he would have gone to trial instead of pleading guilty. Hill v. Lockhart, 474 U.S. 52, 59 (1985).

Petitioner's claim fails, first, because the transcripts of the three Rule 11 colloquies make clear that he was advised of the two, twenty-year and one, ten-year maximum sentences that he faced for the charged offenses. Three separate times, Petitioner acknowledged under oath that he understood these maximum possible sentences. The sentence he received was well below that maximum. Second, in each of his plea agreements, Petitioner acknowledged that any estimates about his potential sentences, including any made by his own counsel, were just that – estimates – and not promises. Finally, as the Fourth Circuit has recognized, even if a defendant is misadvised by his trial counsel, he cannot show prejudice as long as the misinformation he received was corrected by the district court. See United States v. Foster, 68 F.3d 86, 88 (4th Cir. 1995) (recognizing that "any misinformation [defendant] may have received from his attorney was corrected by the trial court at the Rule 11 hearing, and thus [defendant] was not prejudiced"). Similarly, in United States v. Lambey, 974 F.2d 1389 (4th Cir. 1992) (en banc), the Fourth Circuit stated that "if the information given by the court at the Rule 11 hearing corrects or clarifies the earlier erroneous information given by the defendant's attorney and the defendant admits to understanding the court's advice, the criminal justice system must be able to rely on the subsequent

dialogue between the court and defendant." Id. at 1395. Petitioner cannot show prejudice, even if misadvised by Ms. Jayne, because he was properly advised as to the statutory maximum terms of imprisonment by the Court during the Rule 11 hearings and he affirmed his understanding that he could be sentenced to maximum terms of twenty years, ten years, and twenty years, respectively. Accordingly, his claim of ineffective assistance of counsel on this issue fails.

## IV. CONCLUSION

For the reasons stated herein, the Court finds that Petitioner is not entitled to relief, and the Court will therefore dismiss the motion to vacate. To this extent, the Court grants Respondent's motion for summary judgment. Furthermore, Petitioner's various motions for discovery will be denied, as Petitioner has not met the burden of showing that he is entitled to discovery.

The Court further finds that Petitioner has not made a substantial showing of a denial of a constitutional right. See generally 28 U.S.C. § 2253(c)(2); see also Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong") (citing Slack v. McDaniel, 529 U.S. 473, 484-85

(2000)).   Petitioner has failed to demonstrate both that this Court's dispositive procedural rulings are debatable, and that the Motion to Vacate states a debatable claim of the denial of a constitutional right.   <u>Slack v. McDaniel</u>, 529 U.S. at 484-85.   As a result, the Court declines to issue a certificate of appealability.   <u>See</u> Rule 11(a), Rules Governing Section 2255 Proceedings for the United States District Courts, 28 U.S.C. § 2255.

## O R D E R

**IT IS, THEREFORE, ORDERED THAT:**

1.  The Government's Motion for Summary Judgment [Doc. 12] is **GRANTED.**

2.  Petitioner's Section 2255 Amended Motion to Vacate, Set Aside, or Correct Sentence [Doc. 1] is **DENIED** and **DISMISSED** with prejudice.

3.  Petitioner's Renewed Motion Requesting Leave to Conduct Discovery [Doc. 16], Petitioner's Renewed Motion to Expand the Record [Doc. 18], and Petitioner's Renewed Motion Requesting Psychological Expert to Establish Matter for the Defense Pursuant to 18 U.S.C. 3006A [Doc. 19] are **DENIED**.

4.  The Court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**

Signed: February 3, 2014

Martin Reidinger
United States District Judge